And indeed our last case today is Enright M.K. Allender v. Smedley. That's case number 4-100853. For the appellant we have Michael Goldberg. For the appellee, Russell DePue. Mr. Goldberg. May it please the court, Mr. DePue. Your honors, my client is before you today asking that you reverse the trial court's decision denying her grandparent visitation with her grandchild. I took intention that the trial court's decision was against the manifest weight of the evidence. You can see by looking at the evidence and looking at the judge's decision that the judge misread Flynn v. Henkel and didn't apply Flynn v. Henkel correctly to the facts in this case, and was not quite sure what to make out of Dr. Osgood's testimony. Dr. Osgood was the expert who testified about the harm that would and would be likely to occur from the parent's denial of visitation. If you look at the judge's opinion on page 90, the judge says the court never heard her specify what the harm would be. And the her is Dr. Osgood. But if you read Dr. Osgood's testimony, and her testimony is cited in our brief starting at page 43, Dr. Osgood talks about short-term and long-term harm to the child. And in essence, what she's saying is that the child was born in 2003, and my client had raised this child for a little over four years by the time that the child was taken away. And the child wasn't necessarily taken away from my client, but from the mother. And the mother lost her rights, but well before the mom lost her rights, my client, the maternal grandmother, was raising this child with the maternal great-grandmother. And you have the factors in the Grandparent Visitation Act, and it talks about whether you're a caregiver for 12 months, whether you're a primary caregiver for 6 months, whether the child lives with you for 6 months. If you go through each one of the factors that are attached at the end of the Grandparent Visitation Act, every one of those factors is in support of, the testimony is in support of the visitation for my client. And Dr. Osgood's testimony and her opinion are that when you have a child, you have a mother and the mother loses her rights, the mom was a prostitute and had drug problems, and you have a stability of another adult in your life, two adults, the grandmother and the great-grandmother. And there's also testimony about one of the child's other siblings, a half-sibling. When you have that nurturing relationship that goes on for more than four years, and you break that relationship, that is the type of harm that is envisioned in the Grandparent Visitation Act, and that the court, or that the law, is trying to avoid. And so she talks about the child having actual harm of not being able to form bonds and relationships, and this being a situation where, okay, you lost a relationship with your mom, then these other two people stepped in, your great-grandmother and your grandmother, and then you're going to lose that relationship. She began to know her biological father, the respondent in this case, I think a little over two years from when she was born, in November of 05. Overnight visitation took place with the father in November of 06, so we have over three years goes by before the child even has an overnight visitation with the father. So for all of that time, there's this bond forming between the great-grandparent, the grandparent, and... And it's important to note that during the time between November of 2005, when paternity was established, and December of 07, when the child was taken away from the mom, and therefore taken away from the grandmother and the great-grandmother, the great-grandmother and the grandmother were trying to incorporate the father into the child's life. The testimony is that they allowed visitation, that they helped facilitate that. But from December of 07 on, when the father got custody, that same type of facilitation, or allowing the child to see the grandmother and the great-grandmother, was not occurring. As a matter of fact, testimony from the father was that it took almost two years for the child to become appropriate and healthy and normal, and that there was a significant adjustment period between December of 07 and when the child finally felt okay with not seeing her grandmother or great-grandmother, or was projecting as a normal child. Well, I would submit, Your Honors, that that is the type of harm and the type of suffering that a child should not have to go through, did not have to go through, and is the harm that's continuing, and that this act is trying to prevent. There'd be nothing, there's no testimony, no fact in this case that points to the grandparents not being able, or the grandmother and the great-grandmother, not being able to have continued visitation with this child, and the fact that it's not... This isn't a case, however, where they just want to show up on a Sunday afternoon and see the child, is it? Well, I don't, I think the testimony is that they would take any visitation that the court would give. What's at issue here was they want it overnight? They want it overnight, correct. So that's, the question is whether that was a decision by the court that was contrary to the manifest way of the evidence to deny it? Well, considering that this child lived exclusively with the petitioner for over four years, I believe it is against the manifest way of the evidence, and I believe that Dr. Osgood's testimony talked about the significant attachment. She interviewed the child. She interviewed the grandmother and the great-grandmother. I don't believe the father made himself available to be interviewed by Dr. Osgood. Dr. Osgood testifies that Michaela risks having problems maintaining relationships and being able to have stable relationships that are secure, and to be able to maintain them. I think, if you look at the judge's opinion, the trial court's opinion, the one case that the judge cites is Flynn v. Hankel, which is absolutely opposite of what's happening in this case. Flynn v. Hankel, which went up to the Illinois Supreme Court. Well, all these cases are fact-intensive, counsel. Right. The court cited that as the basis of the applicable law, didn't it? Well, yes, but the law that the judge was seeking to apply does not apply to this case. The situation there, the judge in Flynn v. Hankel made a finding that, well, the judge and the appellate court said, we want to preserve this relationship. We want to preserve this side of the family, and it would be harmful for this side not to be able to establish a relationship, because then one half of your biology is essentially cut off. And the Illinois Supreme Court said, no, we're not going to tell you what harm is, but we'll tell you what harm isn't. If harm is not, you never get to know this side, or this relationship never gets established. And the Illinois Supreme Court reversed. But in this case, it's uncontroverted that there was an ongoing four and a half years. Flynn v. Hankel, there was maybe a dozen visits, probably less, and nothing overnight. And they were a few hours at a time. Is the child prospering now? The child is – everyone says the child is prospering now. If you look at Dr. Osgood, Dr. Osgood says that – What about the GAL? The GAL did not want there to be visitation. Why? Because the GAL felt that the child had moved on and that there'd be no reason to confuse the child. That's the summary of the GALs. What weight should be given to that view? Not nearly as much as an expert. Why? Because the expert has the training and the knowledge base and the objectivity and is not – The GAL doesn't ride the court upon the GAL? To assist the court. But the GAL was cross-examining witnesses and became an adversary on behalf of a client. It's not the same thing? Whose interest was the GAL looking after? The child. So who's the adversary? He becomes adversarial to the grandmother. The standard of review is that no reasonable person could have taken the position adopted by the trial court. That's what we have to conclude to reverse, isn't that? Yes. Manifest way to the evidence. If you look at every single factor in the Grandparent Visitation Act, they all go toward – Counsel, you say the expert's opinion counts more than the GAL's. Is there a case that says that? No. That's just an expression of your opinion. That's my opinion. Right. I interrupted your talk. Go ahead and talk about the factors. The factors of the case, of the statute, and the fact that the judge is against the manifest way to the evidence when you look at the factors of the statute. There's testimony that the child wants to play with her siblings and wants to be with the grandmother. And that comes from the GAL, Your Honor. This report admits that the child wants to see the grandmother and wants to see the siblings. It's our contention that she was happy and healthy today because of the first, in large part, and this is what Dr. Osgood said, because of the first four years of her life and the stability that was provided for her by the grandmother, great-grandmother and the grandmother, when the mother clearly couldn't do that. There was a significant relationship between the child and the grandparents. The grandmother, there's no one that's saying that the grandmother's not doing this in good faith, that she somehow isn't doing it for the right reason. I would say that the dad probably isn't in bad faith in the true sense because the dad probably thinks that he's doing the right thing. But I would say that there's no valid reason for the denial. There was nothing reasonable that you could point to. Why is this case overnight visitation? Because it was overnight visitation for four and a half years. Why didn't the grandparents ask for just to show up on a Sunday afternoon? Well, I don't think that the amount of visitation was the key issue in the case. The grandmother would be happy to have that visitation. But that's not what's being litigated here. Well, I don't know that a specific visitation is being litigated. Well, the question is, it wasn't the petition. She wants overnight visitation on certain dates and times, and that was what was asked of the court and denied. There's no doubt it was asked for by the court. I don't know that it was.  The parents here are trying to establish a sense of permanency. They're the parents and they're doing well by this child. Why wasn't the first step to say the child seems to be prospering? How about letting us ease back into her life with afternoon visitation as opposed to overnight? Well, I'm not sure if that was or was not the case. Well, that's not the case before us, is it? I mean, the petition is we want visitation with this child overnight. It was denied. Right. But I think that there were efforts during the litigation. Is that in the record here? Is that what this petition and this appeal is about? No, it's not. Well, then I don't know about other efforts and records. I'm just raising the point that it seems to me that this is not the same case as it would be if this was a matter of we'd like to ease back into this child's life. Now that there's permanency and she has parents and, you know, just to show up to become reacquainted with this child and to see where that might go and to demonstrate that our presence is beneficial and not harmful at all. Dr. Osgood did testify that should the visitation be ordered, that it be done that way, that it be done one step at a time, that it be a reintegration into the child's life. And I know that my client would accept a visitation that would be less than overnight. Certainly, it's much better than getting nothing. Was that alternatively pled? I don't know if that was alternative. I can't say. Was it your pleading? No, I came into this case when it was in Peoria that had been going on for quite some time. I came in more toward that. It just seems to me, Counsel, as I say, that this would be, and I don't know that the denial of what happened here would be inconsistent with efforts to say, how about let's just spend some time on a Sunday afternoon as opposed to overnight visitation, which seems to me to be a rather more dramatic step as they're trying to establish a new and permanent home for this child. Your Honor, I don't disagree. I think that the judge, it maybe goes toward the manifest way of the evidence, that the judge could have ordered that instead of nothing, and then perhaps the argument of, it wouldn't be there, it wouldn't be an argument, because you couldn't argue that one or two days a month is against the manifest way of the evidence because it wasn't overnight. But what we're dealing now is with nothing. Well, the judge addressed the petition as presented to the court. Correct. Which asked for overnight visitation. He denied it. But there's nothing in the law that says that the judge can't give something less. Did you ask for something less? I don't want to make a representation. I don't even know if the pleading said whatever visitation you would get. I don't know. I think we argued fairly clear. Our number one request is overnight visitation. But look, Judge, if you think that's too much, too quick, could we just take two hours every third or fourth Sunday? I want to think that I argued that to the judge, that it doesn't have to be a specific amount, but I can't make a representation that I did. I was the one that argued. But as I'm sitting here today, I can't swear that I did. As Justice Federer says, it would be, I think, a different posture. The petitioners wanted to ease their way back into the life of this child in the fashion so as to demonstrate that that would be positive for the child and to demonstrate that over a period of time there are no ill effects and it's not contrary to the permanency of the child's home that the parents are now trying to establish. But that's not the question before us. Justice Seidman, I would submit that I think that it is. I don't know of any legal principle that says that if you ask for overnight visitation and you don't get it, that's all you're entitled to get. First of all, we're supposed to look at this as, you know, from the child's standpoint. And I'm just not aware of the principle that says that it's all or nothing. Well, you're talking to someone who is a longtime trial judge. It's a good practice for judges. They are the trier of fact in making determinations to answer the question asked. The question asked is we want overnight visitation. And you say, well, no, I don't think so. Well, we're asking this court to reverse and remand for a proper order and a proper amount of visitation, which not overnight could be some sort of visitation during the day. So you're asking us to reverse and remand with instructions to the trial court to consider something less than overnight visitation? Yes. Or alternatively, I guess you'd like to just say. Well, counsel, I'm looking at the appendix of your brief, which contains the trial court's ruling. Look at page 92. A quote from the trial court issuing this order. The quantity of visitation time requested really hasn't had any impact on the court's decision. I understand Tonya's request to be anything that this court would be willing to give. And I don't think that her requested time is probably more than traditional grandparent visitation would be. So that was on the table in the court's mind anyway, correct? It was. And it's clear that the petitioner did request anything that the court would be willing to give so it doesn't turn on the overnight. So we think that if you say that there should be no visitation for this and no connection in the life of someone who raised them for four and a half years, that's against the manifest way of the evidence. And that there should be some amount of visitation that this court deemed proper. And according to our own case, we'd be willing to have it be a reintegration. Thank you, counsel. You will have rebuttal. Mr. Defuse? Thank you. I can't help but think I read page 92, and I know it's not polite to interrupt, but I think that Judge Fitzgerald's opinion did impact on Justice Thagmann's element of no visitation to the extent that the thing on the table in the pleadings, yes, was overnight and extended in week-long in the summers and those kinds of things, but I don't believe that Judge Fitzgerald, in his opinion, regulated his denial by the element of visitation. Well, that's one of the statutory factors. I would like to point out to the court perhaps a different path. In the Statute 607A3, we talk about no part of this statute shall apply to a child whose interests are in a pending Section 213 Juvenile Court Act or to adopt an unrelated child, meaning an unrelated child like two other of the siblings of Michaela's. Two other siblings were adopted out to unrelated parties, so obviously Tanya is not in here talking about visitation with those two children that were adopted out unrelated. The statute also goes on, though, to show or to say that there's two prongs to the test, an unreasonable denial of visitation and at least one of the following, and then we get into Mr. Goldberg's list, and I agree that the list is compelling in this case. But I also point out that as a supplement to the record, there is a juvenile order that was part of the juvenile case in Peoria, and that was attached as a supplement to the record by motion, by our motion. Judge Fitzgerald and the clerk had lost the exhibits and we didn't get that order back into the court file. But that specifically says, now we're talking about not the family case, the family case meaning the case of paternity, but in the juvenile case. Maternal grandmother Tanya Allender and maternal great-grandmother Nora Dalton to have no contact of any sort with the minor. Now, I want to explain in a forthright way to the court what was anticipated because I was there, and that was the anticipation that we were in the juvenile court, a petition was on file in the juvenile court, and Judge Perum in Peoria said, wait a minute, you're in the wrong courtroom. Until we get to the juvenile case, or until we get to the family case, we're not going to have any contact with anyone. That was, in fact, the order of the court that my client was operating on through then the family case. The family case was transferred to McLean County because an adoption, a related adoption was filed, and the related adoption was awarded June 21, 2010. Now, when I go through the statute here, what I'm thinking is, an easy decision is that there was not unreasonable visitation by Dad because of the court order saying no contact. Judge Fitzgerald didn't buy that, but I still think that that court order, even though it was not specific that these people are bad people or they're not good, that was not the issue, but the issue is that at least from the time of the juvenile order until the filing in the family case of the petition for visitation, my client was fearful of the department coming in and saying, hey, wait a minute, you've let these people see the kid and we weren't supposed to do that, and those kinds of issues that I know you all have been into. Justice Stagman, you referred to the GAL, and I hope that the order that you will decide here gives some direction to guardian ad litems, and I say that not overlooking or not assuming that you're deciding in our favor, but the guardian ad litem here did a tremendous amount of work, was both the guardian ad litem in the adoption file in the Peoria case and in the McLean County case, and it's been my experience, and I'm sure yours also, that guardian ad litems typically are not making the big bucks, and to the extent that they are truly looking out for the benefit of their client, I think that's relevant in this sense, that when the guardian ad litem attempted to contact the petitioners, and you'll find that a couple of places in the record, volume 279, volume 2186 were the guardian ad litem's reactions that he received from the petitioners. They perceived the guardian ad litem as an adversary. Great-grandmother shut the door and said, you're for Smedley. Well, if we're going to empower somebody here with your order, I would hope that the court order will reflect, and I don't fault Mr. Goldberg for that. I'm sure he indicated, hey, cooperate with guardian ad litem and do all those things, but there's some compelling testimony by guardian ad litem that talks about or borders on the idea that he was not given the respect or the possibility. There was another confrontation in his office by Tanya Allen. The confrontation in the record is at 136, and the GAL's version of this confrontation is far different in his office, and in fact, his version is he had to kick out the sister to the grandmother. So I would hope that whatever decision is reached, that a message is sent to the general practice people, hey, if you've got a guardian ad litem, give them respect, and what they say is going to be where the judge gets his information. This guardian ad litem spent at least seven hours with the child, and to that extent, I think that's why I would... How would you sum up what the problem is here with visitation? Why is this a bad thing? I think we have the element of an adoption that is adoptive mother having feelings about getting her act, her children, her child together and progressing with that. I think we have at least a difficulty with the adoptive child, Michaela, our child here, is continuing to visit with the unrelated adoptive two children. Those visits are being done in a once a month fashion. As the child gets older, my clients intend to reconnect with these people. I'm sure you hear that all the time also, but I do say to you that the element of reconnecting to the family is important to my clients. It is important. What's the problem with it now? The quantity, the conditions of visitation, and frankly, the elements of the grandmother then has another child of mom's. So if Michaela goes to grandmother Tanya's, she's got contact with a sibling. Well, the petition before the court for us is a petition seeking court order to force Michael to allow visitation with MK once a month from Friday at 6 p.m. until Sunday at 6 p.m. and one week of summer visitation. Your clients didn't like that. Absolutely, they did not. But what you heard me muse, for lack of a better word, how about showing up on a Sunday afternoon for a couple hours just the two of them. Was that discussed? Was that offered as an alternative? There was mediation. There was mediation in the file. How about from your client's point of view? What's the problem with two hours on a Sunday afternoon? The difficulty is the bad blood that builds up through the litigation process. Did they ever offer two hours on a Sunday afternoon to avoid the litigation process? Yes. Is that in the record? No. Was there ever a response to the petition saying, this is too much, but we'd be willing to go a couple hours on a Sunday afternoon? Frankly, as litigation got to the point of trial, we were no longer willing to offer that, pull that off the table. Why? Because the guardian ad litem, I think, perceived the difficulties that we were having with not only planning, but the lack of respect that was shown to the guardian ad litem. Well, that's a bad thing, counsel. But, you know, lawyers are big people and are supposed to not get their feelings hurt. And, frankly, it doesn't really matter whether or not the guardian ad litem is treated with respect or not. The issue before us and before the trial court is what's best for this child. In the record does contain great-grandmother's disparaging comments about the father. Those were observed at a DCFS visitation. The other element that I would say is significant in the analysis that you're making is the issue that is presented by the guardian ad litem report itself. The guardian ad litem report itself endorses having no visitations. Mr. Goldberg talked about the guardian ad litem becoming an adversary. And I would say, yes, the guardian ad litem did become an adversary. And to that extent... Mr. DePue, you heard Mr. Goldberg here in response to my questions pretty strongly implied, maybe even stated explicitly, oh, sure, we'd be happy with, you know, we want what we wanted, but we'd be happy to accept visitation on a Sunday afternoon for a couple hours. Was that ever communicated at trial? No. Or was the position of the petitioners before the court, this is what we want, period? That is correct. So to speak, an all or nothing kind of... For lack of anything better, an all or nothing, I'll point out, as Justice Appleton talked about on page 92 of the order, I don't think Judge Fitzgerald realized the dilemma that my clients were having even offering that element of visitation. And I say that not attempting to disrespect what you're saying. Someone who is not attached to any of these people, I'm just reading about this case for the first time, likes to view it as glass half full instead of half empty. It seems to me, you know, the child seems to be doing well now. It seems to me the biological father and the adopted mother want to make a solid, permanent home for this child. That's all for the good. At the same time, no child can be loved too much. We have a maternal great-grandmother and grandmother who have had significant roles in this child's life, and I'm not sure what part of it appears to be negative. Was there some negative part of that? Yes. What was it? The misbehavior at the guardian ad litem's office would be one incident. Well, how about as manifested with regard to the child? They didn't see the child. Well, when the child was being raised by them. And, again, that gets back to the statute. Again, now I'm back with Mr. Goldberg in the sense that they need to prove harm to the child. That's what the law says. And they haven't proven harm, so, therefore, the parental rights are, and I don't resent your questions, I'm saying it's not a balancing test. That's the whole big deal with the Troxel. If we were to affirm the trial court here, how do we try to address the situation so that some visitation can be achieved short of what was requested here? I don't believe that that is within the law. Again, I'm not disrespecting your statement. I'm saying that the harm that's required to be shown has not been shown. Well, assume we affirmed. Are they forever precluded from seeking some type of visitation? I don't think so. When could they again petition the court? Well, I think the statute, if you look back, Justice Turner, there's a two-year window, kind of like your visitation deal, and my feeling would be that they've got a two-year probably stopgap. If they had not been disrespectful towards the guardian, then there would be no problem with the visitation? I think as the child ages, it is the intent of the adoptive mother and natural father to incorporate this family. What does that mean? To have the once a month, two hours at McDonald's or something along those lines. Some incremental involvement of officials? No, I don't think so. And that's part of the difficulty in the sense that as the child gets older, I guess I'm trying to think conceptually where you end up, but I don't think you end up with overnight in the weeks the same that a non-custodial parent. I don't think you'll ever end up there. I would hope you would not end up there because that would certainly impose a burden. So at some point in the future that you don't know when that would be, you see visitation in the home or going out to a park with these petitioners and the child is being permitted by the parents? Yes, and that's in the record. Particularly the adoptive mother indicated that this was not the time. She was more focused on this not being the time, not so much addressing the quantity issues. But going back to Justice Turner, I think there is that two-year shot. You can go each two years. Does it require a substantial change of circumstances or something like that? I can review the statute. Well, let me be more blunt, counsel. Other than their behavior with regard to the guardian line-up, what's the problem with the petitioners? The petitioners are not respectful people. Respectful of the father and adoptive mother? Yes. What was the genesis of the juvenile proceeding in Peoria County? DCFS taking the children from mother and the natural father, then participating in about two years of litigation in the J case. But what was the reason for the Peoria Juvenile Court to enter an order prohibiting contact between Mr. Goldberg's clients and the child? What was that all about? I respectfully try to answer that because I think it was because they were unruly at that level and it was difficult for the judge to step away from the case. Unruly with DCFS? Yes. DCFS and the juvenile court itself. Again, that's not in the record. You supplemented the record, by the way, with the juvenile stuff. Did Judge Fitzgerald have that before him at the time? He did, yes. I want to make sure that we're seeing. I'm concerned that we have something before us that he didn't see. No, he saw that and it was given to him and there is in the record a discussion about that and I attempted to relay the same issue. The same issue that Judge Perum did not say these are bad people, but he did say until you get litigated in the F case, I'm not going to have this be a sideshow in the juvenile case. In Curia they have the juvenile cases, I call them linked together. So there were like three of mom's children and he was attempting to get us kicked out the door when he found that the natural father was a fit parent. He was attempting to move us on. One point, Justice Turner. I think A7-1 talks about the two-year issue that you talked about. No motion to modify a grandparent order can be made earlier than two years after the date was filed and there's no substantial change in circumstance or language that I see there. Thank you, counsel. Your time is up. We'll have rebuttal now, please. Thank you. I would submit that the tension between the GAL and the grandparent was a significant driving force in how long the case lasted. What caused the tension? Well, the tension was caused by the fact that all of the animus and bad feelings should have been exclusively directed at the mother, who clearly deserved it. The grandparents, by no formal order, were essentially the parents for four and a half years. Because of something that the daughter did and continued to do, the child gets taken from them. And then the system is essentially against them for things they didn't really do. The answer to your question about is there any problem when they were raising the child, nothing. The testimony from both sides is that that was a healthy, thank God they were there period of the children's lives. What about the juvenile court order that Justice Appleton inquired about? That seems a little bit harsh, no contact under the Jay case with your clients. I was not there, but I would not be surprised if the same type of attitude toward DCFS arose with the GAL. But I would point out that the Grandparent Visitation Act specifically excludes a grandparent from petitioning into a DCFS case. So if I'm the trial judge, why shouldn't the, for lack of a better way to put it, the problems with your clients, both in Peoria and now with the GAL, why shouldn't that serve to inform me as to whether they are, as Mr. Dupuy put it, appropriately respectful of parental options in this case so that they can at this point be permitted by court order to be involved in the life of this child if the parents allow them to be. Because there's no testimony to indicate that any of that spills over into the relationship with the child. Well, people aren't so easily compartmentalized, counsel. It seems to me if they can't behave themselves with regard to a GAL, there's good reason to believe they can't behave themselves regarding the parents either. I would respectfully disagree with you. Based on what? Based on the fact that I think any parent that has a child taken away from them for something that has nothing to do with themselves is going to feel frustrated and angry. Counsel, I was a juvenile court judge in my county for 10 years. I don't recall ever seeing a report or concern about a set of parents or grandparents' behavior towards a GAL that I read in this case. This is really very unusual and doesn't speak well of your clients. But my clients were being punished for something that they didn't do. Well, no. It's not being punished. It's a matter of informing who they are, how they behave, and how mature and respectful they are. And if they can't deal with the court-appointed lawyer looking out for the grandchild's best interests, then what does it say about their ability to comply, for instance, with parameters set by the parents? There's no evidence that they can't submit to any court orders that they would ignore a court order. The evidence shows that they were frustrated and angry with the system that took a child away from them that had nothing to do with them. I think that's a rather human response, and I don't think that's inconsistent with being a good parent. It's not right, and they shouldn't have done it, and it's clearly being counted against them. And the child is also suffering because of it, but hopefully we can move past that and with the proper order and the proper conditions on visitation, perhaps easing into it, this child can continue her productive and happy life without continuing to suffer the harm that she's suffering because of being denied the visitation with her grandmother, her great-grandmother, and a sibling. I've heard nothing to indicate why this child, Channing, shouldn't get to see her sister, Michaela. And she was a petitioner. So it's our intention that if you go through the factors in the statute, every single one of them goes towards visitation. I was involved in a grandparent visitation case here less than a month ago on the other side, and the litigants are not very clear on what the law means and what harm means. But here you have four and a half years living together. You've got an expert who testifies in front of visitation. I think the litigants deserve to be told what this statute means and that it should apply in this case. Thank you, counsel. Thank you. The case is submitted. The court stands in recess.